# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**09-14280**
**CIV-MOORE**

MAGISTRATE JUDGE
LYNCH

| | |
|---|---|
| ALAN K. RICHARDS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| AYUSMAN SEN, PENNSYLVANIA | ) |
| STATE UNIVERSITY, PENN | ) |
| STATE RESEARCH FOUNDATION, | ) |
| and McQUAIDE BLASKO FLEMING | ) |
| & FAULKNER, INC. | ) |
| | ) |
| Defendants | ) |
|_____| / |

FILED by ___ D.C.

AUG 13 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## COMPLAINT

Plaintiff Alan K. Richards hereby files this Complaint against Defendants Ayusman Sen, Pennsylvania State University, the Penn State Research Foundation, and the McQuaide Blasko et al law firm, and states as follows.

A prior complaint addressing the same events was filed previously, identified by Docket Number 2:07-cv-14254-KMM. It was dismissed, even though the Court held that the Florida Long-Arm Statute was satisfied, because insufficient evidence was presented by Plaintiff to show that the requirements of due process had been met, to establish jurisdiction over the Defendants in federal court in Florida. This revised Complaint has been amended accordingly, and it is believed and asserted that all statutory and constitutional requirements for jurisdiction and venue are fully met by this filing.

1

## I. JURISDICTION AND VENUE

1. Subject matter jurisdiction for this suit exists under each and all of the following:

      (i) the patent laws of the United States, 35 U.S.C. 101 et seq.;

      (ii) the Uniform Declaratory Judgment Act, 28 U.S.C. 2201 and 2202;

      (iii) the federal law prohibiting unfair competition (Lanham Act, Section 43), 15 U.S.C. 1125.

2. Personal jurisdiction over each and all of the Defendants arises under Florida's Long Arm Statute, '48.193, which applies to tortious acts that are committed knowingly and intentionally against individuals who are known, to the wrongdoers, to be Florida residents.

3. Alan K. Richards (hereafter referred to as Richards) resides and has his principle place of business in Martin County, Florida, in the Southern District of Florida.  Venue is proper in the Southern District of Florida under 28 U.S.C. 1391(b).

## II. PARTIES

4. Plaintiff Richards is a chemist, and is the inventor and owner of various U.S. and foreign patents and patent applications that describe and claim a process he discovered and conceived, for converting methane gas into stable liquids that can be transported by tanker or pipeline.

5. Defendant Ayusman Sen (hereafter Sen) is, and at all relevant times has been, a chemistry professor employed by Pennsylvania State University, located in State College, Pennsylvania. In all actions described herein, Sen acted with both actual and apparent authority as an agent for both Pennsylvania State University and the Penn State Research Foundation. Sen's actions described herein were done with the knowledge of, and for the benefit of, that University, and for the Penn State Research Foundation.

2

6. Defendant Pennsylvania State University (hereafter also referred to as Penn State University, or simply Penn State) is located in State College, Pennsylvania.  It is a not-for-profit educational institution, organized and operating in the Commonwealth of Pennsylvania.

7. Defendant The Penn State Research Foundation (hereafter also referred to as the Research Foundation) is a subsidiary, affiliate and/or agent of Penn State University.  The Research Foundation owns, manages, and licenses patents for and in behalf of Penn State University and its professors and researchers. The Research Foundation maintains its principal offices on the campus of Penn State University.

8. Defendant McQuaide, Blasko, Fleming & Faulkner, Inc. (hereafter McQuaide Blasko) is a law firm that works for and is an agent for Defendants Penn State University and Penn State Research Foundation, and for professors at Penn State. It is the law firm which filed and prosecuted the fraudulent patent application that falsely claimed that Ayusman Sen and Sen's research assistant were the only inventors of a chemical process, even though Sen and his assistant learned about the chemical process from Plaintiff Richards, the true inventor. Attorneys at Defendant McQuaide Blasko et al played active and essential roles in tortious acts committed collectively by the Defendants, and those attorneys actively helped plan and implement criminal acts that led to this dispute, including perjury, fraud, theft, and criminal conspiracy.

## III. COMMON ALLEGATIONS OF FACT
### PART 1: EVENTS OF 2003-2005

9. In February 2003, Plaintiff Richards conceived of a new chemical process for converting methane gas into liquids that can be transported across oceans or continents by tanker or pipeline.  Richards sought patent protection, and was granted U.S. Patent No. 7,282,603 (hereafter referred to as the Richards '603 Patent, Plaintiff's Exhibit 1).

10. Briefly, the chemical process discovered by Richards involves:
      (i) breaking apart a strong peroxide compound (such as a di-sulfuric acid

3

compound called Marshall's acid, with the formula $HO_3SO-OSO_3H$, also written as $H_2S_2O_8$) to release two strong and powerful "radicals", with each radical having an unstable and highly reactive unpaired electron;

(ii) using those two radicals to remove hydrogen from molecules of methane, in a way that creates methyl radicals;

(iii) enabling the methyl radicals to undergo a chain reaction with sulfur trioxide, in a manner that forms a compound called methane-sulfonic acid (abbreviated MSA), which has the chemical formula $H_3C-SO_3H$, with a methyl group ($H_3C-$) bonded directly to a sulfonic acid group ($-SO_3H$), which can also be called a sulfate group.

This process can be called a "radical-initiated chain reaction". When the strong peroxide compound (i.e., the initiator compound) is broken apart to start the reaction, each radical released by the peroxide will trigger a chain reaction that causes thousands of molecules of methane gas ($CH_4$) to bond to sulfur trioxide ($SO_3$), in a precise and consistent manner that rapidly creates almost completely pure methane-sulfonic acid ($H_3C-SO_3H$). The peroxide initiator compound is quickly consumed and exhausted; however, it does not need to be present in order to keep the chain reaction going, so long as fresh methane and sulfur trioxide are pumped into the reactor.

11. The MSA compound, which is a liquid, is removed from the first reactor and sent to a "downstream" reactor. In the "downstream" processing, the sulfate group is removed from the MSA and recycled back into the system. This completely avoids and eliminates a major waste problem. The methyl portions of the treated MSA molecules are converted into stable liquids (such as methanol, also called methyl alcohol) that can be transported efficiently to distant markets, such as by tanker or pipeline.

12. Because of complex reasons, rapid and efficient conversion of methane gas into stable liquids was never previously possible. As a result, more than $100 million worth of methane gas is being burned, destroyed, and wasted every day, in useless flares at thousands of "remote" oil fields and facilities around the world. The process discovered by Plaintiff Richards can put an end to that wasteful and destructive process, and can eliminate hundreds of millions of tons of greenhouse gas emissions every year.

13. After conceiving the invention, Richards obtained the paid assistance of a computer modeling specialist to create a computer simulation (or model) of the chemical process, using very sophisticated software and a very powerful computer at a university (which was not Penn State University). As one of the essential steps for creating that computer simulation, Richards had to specify, in exact detail, every reagent that would be present at the start of the reaction.

14. The results of the computer simulation showed that the reaction would occur at temperatures lower than the boiling point of water. The computer simulation also showed that the reaction would be both efficient and selective, with high yields of the desired MSA product, and only small quantities of any unwanted byproducts. The results and predictions of that computer simulation were later confirmed to be entirely accurate and reliable.

15. Since the computer simulation required that all starting reagents and conditions had to be specified in complete detail, and since the computer simulation accurately and reliably predicted how the reaction would proceed, and what the products would be, Richards had fully "conceived" of the invention, as that term is used and interpreted under the U.S. patent law, by the time the computer simulation was completed and its results had been analyzed and interpreted. All insights and research that were necessary to:

 (i) specify all reagents, solvents, initiator compounds, and suitable reaction conditions for the chemical reaction;

 (ii) know and understand what the product of the reaction would be; and,

 (ii) fully recognize and understand the significance of the computer modeling results, and of the practical, industrial, and commercial importance of the reaction,

were fully completed and accomplished by Plaintiff Richards, with no assistance of any sort from Defendant Sen, before Richards disclosed any information about the process to Defendant Sen or any other Defendant.

5

16. After the computer simulation work had been fully completed, Plaintiff Richards disclosed the chemical reaction and the computer modeling results to Defendant Sen. This disclosure was covered by a confidentiality and non-use agreement (Plaintiff's Exhibit 2) signed by Defendant Sen on June 5, 2003.

17. While that agreement was being created and before it was signed, Sen was instructed, in writing, on two separate occasions, to send the signed agreement to Alan Richards at Richards' mailing address in Florida. This is shown by e-mails sent by Richards to Sen in May and June of 2003 (Plaintiff's Exhibit 3). Accordingly, Defendant Sen (and, by implication, his employer also) already knew, before Sen or Penn State ever signed any agreement with Richards or did any work relating to Richard's methane conversion process, that Richards was located in Florida.

18. Sen executed the Confidentiality Agreement in order to obtain enough information to enable him to make a well-reasoned and properly-informed decision on whether he and his employer (Penn State University) should become involved in testing the chemical reaction that Richards was willing to disclose to Sen. After Sen received that information from Richards, Sen recognized the potential value of the reaction, and agreed that he wanted to become involved in the project. Therefore, both Sen and Richards contacted the proper Penn State officials, and they jointly created a second contract with Penn State (the "STTR contract"), as described below. There was no effort or intent, by either Sen or Richards, to bypass or circumvent Penn State; instead, the confidentiality agreement signed personally by Sen was a necessary and appropriate first step, which soon led to Penn State's involvement and the STTR contract.

19. Both of those contracts, signed by Defendant Sen and Defendant Penn State University, were counter-signed in behalf of an entity called GTL Technologies, Inc. That corporation was founded by, and at all times was solely owned by, Plaintiff Richards. During its existence, GTL Technologies, Inc. acted lawfully and properly, and Plaintiff Richards enabled that corporation to meet and fulfill every commitment it made. However, GTL Technologies was never made the owner or assignee of any patent rights, and Richards was never subject to any legal duty to assign any patent rights to a company that he formed and owned.

20. Defendants were directly and explicitly informed, on numerous occasions, that Alan Richards (rather than GTL Technologies) was the owner of the patent rights. As just one example of that information being conveyed to Defendants, an e-mail from Alan Richards to Robert Baker, an official at Penn State, dated September 6, 2005 (Plaintiff's Exhibit 4), contained the following abundantly clear statements by Alan Richards:

> 3. I am the sole inventor and the sole owner of every patent application that has been filed to date. They all have been filed in my name, personally ... GTL Technologies is not listed or mentioned, anywhere, in any patent application I have filed. It is not and never has been an assignee, owner, licensee, or any other property holder, in any patent application I have filed. I am the founder and sole owner of that company. Because of that status, I am not an employee of the company, and I have no legal obligation of any sort to ever assign any portion of my own personal property (which includes my patent applications) to that company.
>
> As a result, your reference to "the GTL invention", in your letter to Michael Hill, is wrong, and it needs to be corrected.
>
> For your information, I have been advised by my attorney that, for entirely valid reasons, I should NOT assign or license any of my personally-owned patent rights either to GTL Technologies, or to any other company, until it becomes clear how the inventions will be commercialized, and by whom. Any such assignments or licenses would needlessly entangle and complicate various business and legal planning and transactions that will need to take place in the future, which may involve a joint venture, consortium, or other arrangement. I've accepted that advice from my attorney, I have every reason to believe it is valid and reasonable, and I will not take any actions to the contrary.

21. Accordingly, Defendants knew, before they ever signed any contracts with Richards and/or GTL Technologies, that they were being asked to do business with a chemist/inventor who lived and worked in Florida. They also were directly and explicitly informed in September 2005, long before they paid the "issue fee" in June 2006 which caused the Sen '226 patent to

issue as a patent (as discussed below), that Alan Richards, *an individual who lived and worked in Florida*, was *the sole and exclusive owner* of the patent rights that Defendants were unlawfully attacking and damaging.

22. Due to the damage that Richards' company (GTL Technologies, Inc.) suffered because of the illegal acts of the Defendants, that company became unable to carry out its intended business. Accordingly, GTL Technologies, Inc. became inactive. Any rights and/or obligations that might have someday arisen or attached to that corporation therefore reverted to its founder and sole owner, Plaintiff Alan Richards, to the extent that any such rights or obligations survived and reverted to anyone.

23. Although Defendants Sen and Penn State University grossly, egregiously, and deliberately violated and breached the contracts they signed with GTL Technologies Inc., there are no claims or counts herein for breach of contract, which generally are matters of state law. Instead, the claims and counts in this federal complaint arise directly from violations of federal laws, including the U.S. patent law.

24. In June 2003, after the Confidentiality Agreement (Exhibit 2) had been signed by Sen, Richards provided to Sen a set of password-protected files containing a written report and a drawing, both of which were created by Richards with no input of any sort from Sen. The Richards drawing, and the relevant portions of the Richards report, are enclosed as Plaintiff's Exhibits 5 and 6. The second page of Exhibit 6 contains an expanded copy of the left side of the drawing, with several annotations added.

25. The drawing and report in Exhibits 5 and 6 were written by a chemist, for other chemists. As a result, those documents contain phrases, symbols, and other information that require explanation, for people who do not specialize in chemistry. Therefore, Plaintiff's Exhibit 7 is an analysis that describes and explains, for someone who is not a professional chemist, how and why the Richards report and drawing disclosed to Defendant Sen (a chemistry professor with previous experience in this specific field of chemistry) each and all of the following elements of

8

the methane conversion system:

(i) methane gas and liquid $SO_3$, from separate sources, are pumped into a reactor, under pressure;

(ii) the reactor is loaded with an initial quantity of MSA, which will act as a solvent that helps promotes the gas/liquid reaction;

(iii) a compound called Marshall's acid (a strong peroxide) is activated by an energy input, causing its peroxide bond to break, thereby releasing two sulfuric acid radicals;

(iv) the sulfuric acid radicals from the "activated" Marshall's acid are pumped into the reactor vessel that holds the methane gas, the liquid $SO_3$, and the MSA solvent;

(v) each sulfuric acid radical will initiate a chain reaction that causes methane molecules to bond to sulfur trioxide molecules, in a precise and specific manner that creates essentially pure MSA, which emerges from the reactor as a liquid;

(vi) the liquid MSA product is removed from the reactor, and is sent to a "downstream" reactor, which "cracks" the MSA molecule (i.e., it splits the MSA into two parts, without adding any other atoms) in a way that removes sulfur dioxide ($SO_2$) from the MSA;

(vii) the $SO_2$ is oxidized to convert it back into sulfur trioxide ($SO_3$), which is recycled directly back into the reactor that creates MSA;

(viii) when $SO_2$ is removed from the MSA, the remainder of the MSA molecule rearranges itself, and one of the three oxygen atoms (initially attached to the sulfur atom in the MSA) shifts to a new location, and becomes bonded to the carbon atom in the MSA. This releases methanol (also called methyl alcohol), which is a stable liquid fuel that can be transported across oceans or continents via tanker or pipeline.

26. In plain and simple terms, the drawing and report in Exhibits 5 and 6, which Alan Richards provided to Ayusman Sen (under a signed Confidentiality Agreement) taught Sen every important element of how to carry out the exact same reaction which Sen later claimed -- falsely and fraudulently -- that he discovered and invented. The documents in Exhibits 5-7 show and prove that *Plaintiff Richards conceived of, and then disclosed to Defendant Sen, each and*

9

***every one of these features of the chemical reaction***:

      (i) the exact combination of reagents that are mixed together to carry out the reaction;

      (ii) the exact product of the reaction;

      (iii) the use of MSA as a solvent for carrying out the reaction;

      (iv) the use of Marshall's acid as an initiator that will trigger the chain reaction that causes methane gas to bond to $SO_3$ in a manner that creates MSA; and,

      (v) computer modeling results which predicted -- in an entirely accurate and reliable manner -- that the reaction would proceed efficiently, even under mild conditions (which, in this context, refers to temperatures below the boiling point of water).

27. Plaintiff's Exhibit 7 also describes a scientific article coauthored by Defendant Sen in 1996, cited as "Basickes, Hogan & Sen 1996". A complete copy of that article is enclosed, as Plaintiff's Exhibit 8. That 1996 article by Defendant Sen describes prior efforts by Sen and his research assistants to convert methane into MSA, using various salts to initiate the reaction, and using sulfuric acid as the solvent. Those reactions were slow and inefficient, and Sen completely stopped and abandoned that line of research after 1996. However, ***the equipment and methods Sen used, in his 1996 tests, were exactly the same equipment and methods that were used by Sen to test the new reaction*** that was disclosed to Sen by Richards, in 2003. Richards chose Sen to do the first confirmatory work in a lab, precisely because Richards knew that Sen had already done very similar tests, using exactly the same types of equipment to try to bond methane to $SO_3$ to create methane-sulfonic acid, years earlier.

28. Sen's use of the same methods and equipment, to test the Richards process in 2003, did not require any unusual level of insight or creativity by Sen, once the new combination of reagents and solvent had been taught to Sen by Richards. Sen merely performed the same types of tests he had already described in his 1996 article (Exhibit 8), which had been published years earlier. The differences between the slow and inefficient 1996 test results, versus the fast and efficient 2003 test results, did ***not*** arise, in any way, from any changes or discoveries involving equipment or methodology. Instead, the dramatic increase in the speed and efficiency of the

reaction arose solely from the new reagent-and-solvent combination, which was solely and exclusively the discovery and conception of Richards, rather than Sen. That new reagent-and-solvent combination was directly, explicitly, and completely taught to Sen, by Richards, under a signed confidentiality agreement.

29. Sen received and understood the information provided to him by Richards in June 2003. After reviewing the information he received from Richards (including the detailed results of the computer modeling and simulation work), Sen agreed to participate in laboratory research, to test and confirm the process. This is proven by an e-mail that Sen wrote and sent to Richards on June 16, 2003 (Plaintiff's Exhibit 9). As shown in Exhibit 9, the header of Sen's e-mail referred to the new process as, "Richards system". The text of Sen's cover letter said:

> "I finally had time to think about *your very interesting system* . . . I look forward to the opportunity to test out some [of] *your ideas*." (emphasis added)

In addition, the title of Sen's analysis (a file that was attached to Sen's cover letter, included in Exhibit 9) was, "Thoughts and Comments on *The Richards System*". These statements and admissions were made by Sen, in writing, before Sen later filed a patent application which claimed -- *falsely and fraudulently* -- that Sen was the one who discovered what Sen himself had previously called "The Richards System".

30. After Sen agreed to participate in the laboratory tests, he and Richards notified Sen's employer, Defendant Penn State University, of Sen's desire to test the methane conversion reaction that Richards had disclosed to Sen. Both Richards and Sen cooperated with Penn State to create a research funding contract, signed in July 2003, which is referred to as a "small business technology transfer" contract (abbreviated as "STTR Contract" using a federal acronym). A copy of that STTR contract is provided as Plaintiff's Exhibit 10. Among other things, the STTR agreement, and the accompanying arrangements that were made and agreed to by Plaintiff Richards and Defendant Penn State University, anticipated and provided that:

(i) funds to support the research in Sen's labs at Penn State would initially be paid

11

by GTL Technologies, to Penn State University;

(ii) after certain milestones had been achieved and reported to the federal Department of Energy (DOE), GTL Technologies would be reimbursed for the funds it had paid to Penn State, via a DOE grant award.

31. In reliance on both the Confidentiality Agreement and the STTR Contract, Richards (acting through his solely-owned company, GTL Technologies Inc.) paid $48,000.00 to Penn State, for chemical research that would be performed in chemistry labs supervised by Sen, at Penn State University. That money came from Richards' life savings, and it was never reimbursed or repaid to Richards, by any person, company, or other entity.

32. The initial set of tests in Sen's labs at Penn State used a small closed "batch reactor" (i.e., a specialized beaker designed to withstand high pressures). The results from those "batch tests" exactly followed the predictions of (and therefore confirmed the accuracy of) the computer modeling and simulation work that had already been completed by Richards, with no input from Sen, before Richards disclosed the reaction to Sen.

33. Richards then asked Sen to test the reaction in a "continuous flow" system. Sen refused to take that next step forward, and instead demanded a 10% ownership stake, in Richards' company and patent rights, as the price for his further cooperation. It is not known whether Defendant Sen ever informed his employer (Defendant Penn State University) of that personal act by Sen, or whether that act by Sen may have violated the terms of his employment with Penn State University.

34. Richards refused to transfer to Sen a 10% ownership stake in the patent rights, as demanded by Sen.

35. Beginning in or about March 2004, Defendant Sen refused to cooperate with Richards and GTL Technologies. Defendant Penn State University was informed of Sen's non-performance; however, rather than taking steps to correct the problem and require its

12

employee to abide by the terms of the STTR contract, Defendant Penn State University (and the Defendant McQuaide Blasko et al law firm) instead took steps that blatantly and egregiously violated the U.S. patent laws and the STTR contract, and that actively encouraged Defendant Sen to commit fraudulent and unlawful acts that directly and knowingly violated and damaged the patent rights that lawfully belonged to Plaintiff Richards.

36. With active support, encouragement and cooperation from Defendant Penn State University, Defendant Sen and at least one attorney at the Defendant McQuaide Blasko et al law firm prepared and filed U.S. provisional patent application 60/563,717, filed on April 20, 2004. The first two pages of Defendants' provisional application 60/563,717, which contain a number of "admissions against interest" by Defendants, are enclosed as Plaintiff's Exhibit 11. That provisional application, collectively created and filed by Defendants, falsely and fraudulently asserted that: (i) Sen and his research assistant, Minren Lin, were the only two inventors of the chemical process; and, (ii) Plaintiff Richards did not qualify as even a coinventor, even though Richards was the person who actually discovered the chemical reaction, and who taught the reaction to both Sen and Lin, under signed confidentiality contracts.

37. Beginning in about March 2004, Defendants made it impossible for GTL Technologies to satisfy certain reporting and other requirements of GTL's grant agreement with the DOE. Therefore, in August 2004, GTL Technologies was forced to notify the DOE that it had to cancel and terminate a federal grant agreement which GTL Technologies had signed in August 2003.

38. On November 1, 2005, after a DOE attorney (Thomas Anderson) investigated the matter, the DOE sent an official letter to the Plaintiff, stating that it considered the GTL grant contract to be terminated and "closed out". A copy of that official communication from the DOE was promptly provided to the Defendants, and is enclosed as Plaintiff's Exhibit 12. No money was ever received from the federal government by Plaintiff, or by any person, company, or other entity associated with Plaintiff. Termination of the DOE grant award forced Plaintiff to forfeit and lose a payment of more than $99,000.00 from the DOE. In addition, termination of the DOE

grant award also blocked Plaintiff Richards from moving into a "Phase II" federal grant that would have been worth close to $1,000,000. The extraordinarily positive and promising results of the initial "Phase I" tests would have rendered DOE approval and funding of a "Phase II" grant a virtual certainty, if Defendants had met their obligations under the STTR contract, and had not acted with deceit, dishonesty, and treachery toward Plaintiff.

39. In August 2004, Plaintiff notified Defendants that Plaintiff's company (GTL Technologies Inc.) was terminating the STTR Contract. Until that notice of termination was sent to Defendants, Plaintiff and his company had fully complied with all obligations that applied to them under that STTR Contract.

40. On April 13, 2005, Defendants filed a false and fraudulent U.S. utility patent application, serial number 11/105,245, which later issued on October 10, 2006 as US patent 7,119,226 (the Sen '226 patent; copy enclosed as Plaintiff's Exhibit 13). The Sen '226 patent was assigned to, and is owned by, Defendant Penn State Research Foundation.

41. Defendants obtained the Sen '226 patent by means of fraudulent, inequitable, and unlawful acts, which included but were not limited to the following:

       (i) use of a defective and misleading "inventor's declaration" which violated the requirements of the federal patent law as codified in 35 U.S.C. 115 and 116;

       (ii) deliberate concealment, from the patent examiner, of a crucial item of published prior art that was well-known to Defendants, which was a published patent application by Plaintiff Richards (identified as PCT application WO 2004/041399), which described and claimed the exact same chemical process that Defendant Sen falsely claimed as his own discovery; and,

       (iii) deliberate concealment, from the patent examiner, of crucially important facts pertaining to inventorship (those facts are set forth, in Sen's own words, in documents such as Plaintiff's Exhibits 9 and 19).

42. On or about April 16, 2005, after the Defendants' utility patent application had

already been filed, Sen's research assistant (Minren Lin) provided to Plaintiff Richards a copy of what appeared to be the text of a provisional patent application, designating "A. Sen, et al." as inventors. No additional information concerning that provisional application was provided to Richards by Minren Lin; instead, Lin indicated to Richards that he (Lin) did not know what was happening, but that he (Lin) had been directly ordered by his supervisor, Defendant Sen, to sign some type of patent form, earlier that week. Since Minren Lin (and Defendant Ayusman Sen) had already signed the *utility* application by then, and since Minren Lin apparently did not have and had not even seen a copy of that *utility* application on April 16, 2005 (when Lin provided a copy of the year-old *provisional* application to Plaintiff Richards), the timing and sequence of those events raise serious questions about the conduct of the attorneys at the Defendant McQuaide Blasko law firm. Such questions include:

(i) whether the McQuaide Blasko attorneys ever provided, to Minren Lin, an actual copy of the *utility* (rather than provisional) application, which they apparently pressured and coerced Lin to sign; and,

(ii) whether the McQuaide Blasko attorneys used false statements to manipulate and/or coerce either or both of two purported inventors, who do not speak English as their primary language and who clearly do not fully understand the U.S. patent law, into violating the patent law in ways that apparently sank to a level of criminal fraud.

43. After seeing what appeared to be the text of that provisional application by Sen, but with no supporting or explanatory information, Plaintiff and his attorney repeatedly requested information and/or documents from Defendants, pertaining to any patent application(s) that might have been filed by Defendants relating to the methane conversion process. Despite those repeated requests, Defendants refused to ever provide any such information or documents to Plaintiff, and instead kept their actions deliberately concealed from Plaintiff, in a direct and blatant breach of their duties under the STTR contract which had been signed by Defendant Penn State University.

44. In May 2005, Patent Cooperation Treaty (PCT) patent application number WO 2004/041399 was published, designating Plaintiff Richards as the inventor. It specifically stated,

15

in several locations, that the first laboratory work had been done in the labs of Ayusman Sen at Penn State University. It described the results of the exact same lab tests that were subsequently used by Defendant Sen, in his later-filed application, to describe what Sen falsely claimed to be his own discovery and invention.

45. Immediately upon publication (in May 2005) of the Richards '399 PCT application, Plaintiff Richards (through his patent attorney) provided a complete copy of that publication to the patent attorneys at the Defendant McQuaide Blasko law firm, who were handling the Sen application. Plaintiff's patent attorney explicitly cautioned the managing partner at the Defendant McQuaide Blasko law firm that any attorney working on that application had a binding duty to cite that published application, as prior art, to any patent examiner who might be handling any application on methane conversion by Sen et al.

46. The McQuaide Blasko attorneys directly referred to the Richards '399 PCT application in a letter sent to Plaintiff's patent attorney, dated August 19, 2005, signed by Mark Righter, the managing partner at the McQuaide Blasko law firm. A copy of that letter is enclosed, as Plaintiff's Exhibit 14. It proves beyond dispute that the Defendant McQuaide Blasko et al law firm was aware of the Richards '399 PCT publication, and had recognized its direct relevance to Sen's work. Therefore, there is no valid reason that can justify or excuse their failure (and, indeed, their knowing, deliberate, and repeated refusal) to disclose that item of published art to the patent examiner who was examining Sen's patent application.

47. The "file history" of the examination of the Sen application (which is available to anyone via the Patent Office website, at http://portal.uspto.gov/external/portal/pair) proves that Defendant Sen and the Defendant McQuaide Blasko law firm failed to disclose that published art to the examiner, during examination of Sen's application. In addition, the McQuaide Blasko letter dated August 19, 2005 (Plaintiff's Exhibit 14) proves beyond dispute that the Defendant McQuaide Blasko law firm knew about the Richards '399 publication, long before they received the "Notice of Allowance" which declared that examination of the Sen application was completed, terminated, and closed. That failure to disclose known material information, to the

16

patent examiner, was a direct violation of numerous duties that apply to all inventors and attorneys under the U.S. patent law, including duties that are set forth in sections 1.56, 1.97, 10.23, and 10.85 of Title 37 of the Code of Federal Regulations (CFR). Those direct and blatant violations of the patent laws and rules are more than adequate, with nothing more, to compel a finding that the Sen '226 patent is void and invalid due to fraud, inequitable conduct, and the Applicant's knowing and deliberate concealment of material facts from the examiner.

48. As described in more detail below, when subsequently requested (during a patent reexamination) to justify their failure to disclose that relevant information to the examiner, the **Defendants replied in February 2009 by making statements, under oath and under penalty of perjury, that are totally and utterly false,** as can be clearly proven by documentary evidence. Those utterly false statements were defamatory and libelous toward Plaintiff Richards, who was explicitly named and directly attacked in the Defendants' filing in February 2009.

## PART 2: PAYMENT OF PATENT ISSUE FEE BY DEFENDANTS IN 2006

49. On May 17, 2006, the patent examiner handling the fraudulent application by Sen and Lin mailed out a Notice of Allowance (Plaintiff's Exhibit 15). That Notice of Allowance gave Defendants a period of 3 months (i.e., until August 17, 2006) to decide whether to pay an "issue fee" (which effectively is a publication fee) of $1000. As shown by the enclosed Issue Fee Transmittal Form (Plaintiff's Exhibit 16), the Defendants paid the $1000 fee on June 8, 2006, which was well before the payment deadline.

50. After receiving a Notice of Allowance, any inventor, in conjunction with a patent attorney(s) and assignee (owner), must make a discretionary decision about whether to pay the "issue fee". Payment of an issue fee is required, in order to obtain the issuance of an enforceable patent with allowed claims.

51. Accordingly, the Defendants collectively made a discretionary decision, in June 2006, to pay a $1000 fee in order to have the Sen application issued as a patent. That decision was

17

made and that action was taken, by Defendants, despite and in direct disregard for numerous explicit written warnings, from Plaintiff and Plaintiff's patent attorney, that the Sen application was false, fraudulent, and illegal, and that it was a direct attack against the Plaintiff, who was the proper and lawful owner of the patent rights that were being attacked by Defendants. Plaintiff's Exhibit 4 is a direct, clear, and unequivocal example of the multiple warnings that were given by Plaintiff to Defendants, and it was sent to Defendants on September 6, 2005, which was a full nine months before the Defendants chose to pay the Sen '226 issue fee in June 2006.

52. The payment date for the Sen '226 issue fee (in June 2006) establishes the crucial date for determining whether Defendants had adequate warning, in advance, that they might be haled into a federal court *in Florida*, if they committed fraudulent, defamatory and other tortious and even criminal acts that directly attacked and damaged patent rights that lawfully belonged to Plaintiff Richards. Exhibit 4 clearly shows and proves that Defendants were directly and explicitly warned, long before June 2006, that Alan Richards (rather than GTL Technologies) was the sole, exclusive, and actual owner of the patent rights that Defendants were attacking. In addition, Exhibit 3 clearly shows and proves that Defendants were directly and explicitly informed in May 2003, before they ever signed any contract with Richards or GTL, that Richards was a chemist who lived and worked in Florida.

53. In addition to all of the foregoing, in September 2007, the President of Penn State University (Graham Spanier) and the Senior Vice-President for Research (Eva Pell) were both given direct and explicit warning, by Plaintiff's attorney, about the false, fraudulent, and illegal acts by Defendant Sen, Defendant Penn State University, and Defendant Penn State Research Foundation. That action was carried out by means of a personal letter, signed by the Plaintiff's patent attorney, before "service of process" was completed, which is a necessary step to establish a complaint as an actual and ongoing lawsuit. A copy of the letter to Spanier is enclosed as Plaintiff's Exhibit 17. That letter directly and explicitly cautioned President Spanier (who subsequently delegated the matter to Senior Vice-President Pell) that unless Penn State took steps to correct the problems that had been created by the unlawful acts by certain employees and attorneys, then service of process would be completed, which meant that the informally-mailed

18

complaint would mature into an actual ongoing lawsuit. Accordingly, that letter from Plaintiff's patent attorney gave Defendants a "last chance to avoid" opportunity, which gave properly-empowered officials at Defendant Penn State University a final chance to reverse and correct the illegal acts committed by certain Penn State employees and attorneys, before a complaint was actually served on any Defendants in a manner that actually commenced a lawsuit.

## PART 3: DEFAMATORY ATTACKS AGAINST PLAINTIFF IN 2009

54. Because the Defendants had failed and refused to disclose Plaintiff's PCT publication to the examiner who was examining the Sen '226 application, Plaintiff requested a reexamination of the Sen '226 patent. That reexamination was designated as proceeding 90/008,925. The official records are available to anyone, on the "PAIR pages" of the Patent Office website.

55. On January 2, 2009, the Patent Office issued a rejection of all claims of the Sen '226 patent, since all claims were directly and explicitly anticipated by the teachings in the Richards '399 PCT application.

56. To overcome that rejection, on February 19, 2009, the Defendant McQuaide Blasko law firm submitted a response, which was accompanied by a set of "declarations" signed by purported inventors Sen and Lin. A copy of the relevant portions of that official filing (which remains available to anyone, today, on the Patent Office website) is contained in Plaintiff's Exhibit 18.

Although Defendants certified to the Patent Office, in writing, that they had mailed a copy of those papers to the Plaintiff's attorney, they failed to do so, and instead kept those documents hidden from the Plaintiff's patent attorney for several weeks, thereby rendering it impossible for Plaintiff to file a timely rebuttal before a final decision was made by the examiner.

57. In response to the February 19 filing by Defendants, the patent examiner handling the reexamination simply accepted, at face value and without scrutiny, everything that was asserted in the Defendants' response, even though numerous facts and documents will clearly show and

prove, to anyone who reads them, that numerous statements in the Defendants' response were totally and utterly false.

58. Among other factors, the February 19, 2009 filing by Defendants (Exhibit 18) directly named Plaintiff Alan Richards, and accused him of stealing property that lawfully belonged to Penn State University. That false accusation is set forth in the following locations:

> From page 7 of the February 2009 Response:
>> "the written description of the processes invented and reported by Drs. Sen and Lin, which were ***appropriated and incorporated into Richards '399 without Patent Owner's, Dr. Sen's or Dr. Lin's knowledge or authorization***, are set forth in the comparative Tables 1-8 below ..." (emphasis added)

> From paragraph 9 of the Declaration signed by Defendant Ayusman Sen:
>> "***Without Dr. Lin's or my knowledge or authorization, Alan Richards appropriated*** the identical methane conversion ***processes and embodiments invented by Dr. Lin and me*** ..."

> From paragraph 9 of the Declaration signed by Minren Lin:
>> "***Without Dr. Sen's or my knowledge or authorization, Alan Richards appropriated*** the identical methane conversion ***processes and embodiments invented by Dr. Sen and me*** ..."

59. Those accusations by Defendants, that Alan Richards "misappropriated" something that belonged to Penn State, directly and explicitly accused Alan Richards of thievery, law-breaking, and criminality. Those accusations by Defendants were specifically targeted at a single individual, whom the Defendants knew was a Florida resident. Those false attacks were deliberately intended to irreparably damage and even destroy the standing and reputation of that Florida resident, among any oil and gas companies that otherwise might be tempted to license Alan Richards' patent rights.

60. The accusations quoted above, made by Defendants against Plaintiff Richards, are defamatory, tortious, and actionable, because they are totally and utterly false. Their falsity is clearly proven by approximately 10 pages of e-mails between Richards, Sen, and Lin from the October and November 2003 time period, enclosed as part of Plaintiff's Exhibit 19. Those emails clearly prove that both Sen and Lin knew that Richards was planning and preparing to file a patent application on the research, they knew in advance the specific day that he was planning to file that application, and they approved of Richards' work to get that application ready in ways that included the data they were gathering. For example, they both specifically provided additional information to Richards on more than one occasion, because Richards directly and explicitly told them that his patent attorney had asked for certain items of additional information. Exhibit 19 also includes a sworn notarized affidavit, by Richards, which provides context and support for those e-mails.

61. The false, misleading, and malicious nature of the Defendants' attacks against the Plaintiff is also rendered abundantly clear by a straightforward and undeniable fact. When the Defendants accused Richards of stealing their property, the Defendants totally failed to disclose (and indeed deliberately and intentionally concealed) the absolutely crucial fact that Richards had paid $48,000, to the Defendants, for those research results.

62. The action of the Defendants, who filed an official paper with an investigating agency, accusing Alan Richards (by name) of stealing Defendants' property when in fact Richards had paid $48,000 to Defendants for that property, is absolutely identical, in both form and function, to someone filing a false report with the police, accusing someone of stealing his car when in fact he sold that car (for a very generous price) to the person whom he then accused of theft. If someone files a false report with the police, accusing someone else of a crime while deliberately and knowingly hiding crucial information that directly contradicts and negates the false accusation, then the filing of such a false report, with the police, would quite literally constitute "obstruction of justice", which is a criminal act. There is absolutely no difference -- in either form or function -- between the filing of a knowingly false and deliberately misleading

21

report with the police, and the filing of the knowingly false and deliberately misleading accusations that Defendant Penn State University made, in February 2009, to a federal agency in charge of investigating a dispute. Defendants' clear and obvious intent, in filing a false accusation that Alan Richards had stolen its property while hiding the fact that Alan Richards had actually paid good money to Penn State for what he took and used, was to smear, damage, and destroy the reputation and standing of an honest man who had approached Penn State for research assistance, *and who had paid good money to Penn State for that assistance*.

63. Under Florida law, the defamatory and tortious actions by Defendants in February 2009 constitute "slander of title" (also referred to by terms such as commercial disparagement, injurious falsehood, etc.) against the Richards '603 patent, which is an item of property that is properly and lawfully located in Florida. That patent has been severely damaged by the totally false and tortious accusations made against Plaintiff Richards and his property.

64. The continuing and ongoing publication of the Sen '226 patent (without retraction by Defendants despite the challenges lodged by Plaintiff), and the continuing and ongoing publication of utterly false and defamatory attacks by Defendants against the Plaintiff, constitute a continuing and ongoing tortious offense, by Defendants, against a person who is fully known to Defendants to be a resident of Florida.

65. Beginning in late 2003, as soon as the results of the Sen "batch reactor" tests became available, Plaintiff Richards began informing a number of oil, gas, and chemical companies about the new methane conversion process. After preliminary exchanges of information, Plaintiff Richards entered into a first "option contract" with a major international petrochemical company in March 2004, to enable that company to learn more about the methane reaction so that it could begin evaluating costs, equipment requirements, and economic and commercial prospects. A second similar option contract was subsequently created with a second major petrochemical company.

66. In late 2003 and early 2004, before the rupture of their relationship, Richards advised

22

Sen that he (Richards) had created an option agreement with a major petrochemical company, and was actively seeking other option or licensing agreements with other companies. Richards provided that information to Sen in confidence, in reliance on both the Confidentiality Agreement and the STTR Contract.

67. As a result of Richard's confidential disclosures to Sen, Defendant Sen knew about Plaintiff Richards' licensing efforts and activities in early 2004, when Sen demanded a 10% ownership stake in Richards' company and patent rights as the price of his future cooperation. Accordingly, Defendant Sen (and by implication his employer, Defendant Penn State University) knew about Richards' licensing efforts when Defendants filed their false and fraudulent patent application, and when Defendants paid the issue fee (in June 2006) which caused Sen's fraudulent application to become an issued patent. Accordingly, Sen and the other Defendants acted with the knowledge and intent that their falsehoods would indeed interfere with Plaintiff's ongoing and prospective business relationships with oil, gas, and chemical companies.

68. When Plaintiff's option agreements with two major petrochemical companies expired, both companies declined to pursue or license the technology or patent rights. Both companies informed Plaintiff that their refusal to go forward, despite the huge commercial potential of the chemical reaction, was due to the uncertainties, obstacles, and outright attacks created by Defendants, which severely clouded and damaged Richards' patent estate.

69. The false, defamatory, and tortious attacks by Defendants, against the Plaintiff, are not being made in a vacuum. Because of the Plaintiff's licensing efforts, and because of the importance of the scientific breakthrough that Plaintiff discovered, every major oil and gas company in the world is aware of Alan Richard's discovery, and statements to Plaintiff by industry insiders (including, in some cases, direct inquiries to Plaintiff by employees at such companies) have indicated that a number of oil and gas companies have tested and confirmed the process in their laboratories, and may have built continuous flow units to begin using Plaintiff's new process at various locations outside the US. Those companies have major financial and resource interests that will be directly affected by the patent rights that are being disputed

between Plaintiff and Defendants, and they are monitoring that dispute. Accordingly, those companies presumably have seen and are aware of the openly-published attacks that have been made against Plaintiff, by Defendants.

70. The Defendants' false claims, that Ayusman Sen and Penn State were the inventors and owners of the new and patented chemical process, also have been published in numerous additional sources, including websites that are controlled and operated directly by Defendants, and websites controlled and operated by others as well. This is a conventional, well-known, and desirable aspect of the type of business conducted by entities such as the Defendant Penn State Research Foundation, which makes money by licensing technology created by Penn State professors and researchers, a process that requires it to market Penn State's patents and make them readily accessible and known to potential licensees. A sampling of websites that have published false information, indicating that Defendant Sen was the inventor and Defendant Penn State is the lawful owner of the patented process (without mentioning Alan Richards' contributions or his conflicting patent and ownership rights) includes, as just a brief listing:

http://research.chem.psu.edu/axsgroup/publications.html

http://www.wikipatents.com/7119226.html

http://www.patentgenius.com/patent/7119226.html

http://www.oti.com/oti/patent/20061010-7119226-US-B2

http://www.findthatpatent.com/Process_for_the_conversion_of_methane,7119226.html

http://www.patents.com/Process-conversion-methane/US7119226/en-US/

http://www.patentstorm.us/patents/7119226/claims.html

http://www.highbeam.com/doc/1P3-1147992261.html

These postings typically contain information such as the following, copied directly from the "highbeam" website:

**Pennsylvania Inventors Develop Methane Conversion Process**

*Ayusman Sen and Minren Lin, both of State College, Pa., have developed a process for the conversion of methane. According to the U.S. Patent & Trademark Office: "A process for the facile two-step synthesis of methanol from methane is disclosed. In accordance with the invention, an appropriate combination of initiator and reaction medium is employed to achieve methane conversion in very high selectivity and yield under near-*

24

*ambient temperature." The inventors were issued U.S. Patent No. 7,119,226 on Oct. 10. The patent has been assigned to Penn State Research Foundation, University Park, Pa.*

71. These announcements and publications of false and misleading information, directly by Defendants and also by others with the approval and cooperation of Defendants, have reached and surpassed a level that violates the federal law set forth in 15 U.S.C. 1125, which is commonly known as the "federal law of unfair competition". That statute states the following:

*(1) Any person who, on or in connection with any goods or services ... uses in commerce any ...false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -*
*(A) is likely to cause confusion, or to cause mistake ... as to the origin ... of his or her goods, services, or commercial activities ... or*
*(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,*
*shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.*

72. The damage being inflicted on Plaintiff, by Defendants and their actions, is continuing and ongoing to this day. Any and all current or future licensing discussions that Plaintiff is currently seeking or conducting with oil, gas, or petrochemical companies are being severely entangled and damaged by the ongoing fraudulent and illegal actions of Defendants. Plaintiff's ability to commercialize and market the Richards '603 patent has been severely damaged by the continuing publication of the fraudulent and defamatory Sen '226 patent, and by Defendants' refusal to abandon that patent even though they have been fully warned of its defects, and by Defendants' false and malicious attacks against Plaintiff in February 2009, which remain posted on the Patent Office website as an ongoing publication (and an ongoing defamation) to this day.

73. Defendants' publication of the Sen '226 patent, and of their false and defamatory February 2009 attacks against the Plaintiff, were made willfully and maliciously, in order to gain economic advantage for Defendants, to the detriment of the Plaintiff.

25

## PART 4. DEFENDANTS' UNSUPPORTED DEMAND FOR
## CO-INVENTORSHIP OF THE RICHARDS '603 PATENT

74. By lawful and proper means, Plaintiff Richards obtained US patent number 7,282,603 (Exhibit 1), issued in October 2007. Since Sen's and Lin's tests had used the same testing equipment and procedures that had been developed and published years earlier, and since their results were entirely consistent with and merely confirmed the calculations and predictions that had been made by the computer simulations that had been completed by Richards before he disclosed the process to Sen, then, in the absence of any evidence to the contrary, Plaintiff's patent attorney concluded that the work done by Sen and Lin did not require or contribute any unusual creativity, and instead merely confirmed what had already been fully conceived by Richards. Therefore, based on all available information, Richards' patent attorney concluded that Richards was properly designated as the sole inventor on that patent.

75. Defendants have demanded, in writing and on more than one occasion, that Ayusman Sen must be added as a co-inventor of the Richards '603 patent. One example of that demand is the letter dated August 19, 2005 (Plaintiff's Exhibit 14), which was signed by attorney Mark Righter of the Defendant McQuaide Blasko law firm, to Plaintiff's patent attorney. Those demands have never been made by a registered patent attorney who is qualified to practice patent law; instead, they have been made solely by Mark Righter, who is not licensed, registered, or qualified to practice patent law. On several occasions, Plaintiff's patent attorney has requested Defendants to designate and use a registered patent attorney, to formulate and communicate Defendants' conclusions and assertions that interpret and apply the U.S. patent laws; however, Defendants have failed and refused to do so.

76. In response to Defendants' demand to add Sen as a co-inventor of the Richards '603 patent, Plaintiff's patent attorney asked Defendants to provide him with any documents or other evidence that might support or shed light on Defendants' demand.

77. Despite multiple requests, Defendants have deliberately refused to provide Plaintiff

with any evidence of any sort, to support their contention that Ayusman Sen must be listed as a co-inventor of the Richards '603 patent. Those refusals have rendered it impossible for Plaintiff's patent attorney to reach a properly and fully informed final decision on whether the Richards '603 patent should be corrected, to add either Sen and/or Lin as a co-inventor. Furthermore, before any such final decision is made, a question may need to be addressed as to whether grossly abusive and inequitable conduct, acts of deliberate concealment, calculated betrayal of a coinventor, and acts that may have constituted crimes such as fraud and theft, should disqualify a participant from being designated as a co-inventor, even if his lab work or other contributions might otherwise qualify him to be included.

78. During Plaintiff's attempts to license his '603 patent to oil or gas companies, potential licensee companies have inquired (and will continue to inquire) into whether Plaintiff is aware of any known, prospective, or potential "clouds" or challenges to the validity of the Richards '603 patent. That is basic due diligence for prospective licensees, and Plaintiff is obliged to answer such questions honestly. Plaintiff therefore has been obliged to disclose, to prospective licensees, that Defendants have challenged the inventorship of the Richards '603 patent, and have demanded that Ayusman Sen must be added as a co-inventor of that patent, for the patent to be valid. This has created a major obstacle and impediment to licensing the Richards '603 patent. Therefore, the unsupported and unjustified co-inventorship demand, by Defendants, have damaged and continue to damage the Plaintiff and his patent rights.

79. The co-inventorship demand by Defendants, when combined with Defendants' refusal to provide any evidence to support or justify their demand, is part of Defendants' wrongful and malicious effort to make it impossible for Plaintiff to license his patent rights to oil and gas companies that need to use the process, unless Plaintiff first obtains Defendants' approval. Such actions by Defendants are intended to coerce Plaintiff into giving and surrendering valuable rights and income to Defendants, even though Defendants have not earned and do not deserve any such rights or income and have tried instead to obtain such rights and income by means of fraud, theft, unlawful conversion, and other malicious, injurious, unlawful, and even criminal acts.

27

## PART 5. ANTITRUST VIOLATIONS BY DEFENDANTS

80. As stated by the U.S. Supreme Court in *Walker, Inc. v. Food Machinery*, 382 U.S. 172 (1965), patents by their very nature create a government-approved monopoly, and therefore, if acts of fraud or other illegality are used to improperly create and obtain an unlawful monopoly via a fraudulent and unlawful patent, such acts can violate the antitrust laws of the U.S.

81. As a direct result of Defendants' illegal actions, they obtained a fraudulent patent, which created a type of monopoly. Accordingly, as set forth by the standards of *Walker v. Food Machinery*, those acts by Defendants violated the antitrust laws of the U.S.

## COUNT I
## DECLARATORY JUDGMENT RE: SEN '226 PATENT

82. Paragraphs 1 - 81 are realleged and incorporated herein by reference.

83. Defendants have violated the following requirements of United States patent law:

(i) the requirement to identify the true inventor(s) of an invention;

(ii) the requirement to use language required by the federal patent law, in the forms that were signed by the Defendants' purported inventors; and

iii) the requirement to disclose relevant prior art to the patent examiner.

Wherefore, Plaintiff Alan Richards hereby requests the Court to issue:

(i) a declaratory judgment declaring the Sen '226 Patent to be invalid due to fraudulent and illegal acts by Defendants;

(ii) a permanent injunction enjoining Defendants from asserting the validity of the Sen '226 Patent; and,

(iii) such other relief as this Court may deem necessary and proper.

28

## COUNT II

## DECLARATORY JUDGMENT RE: RICHARDS '603 PATENT

84. Paragraphs 1 - 81 are realleged and incorporated herein in their entirety.

85. Defendants' written statements have asserted that at least one additional inventor employed by Penn State must be added as a coinventor of the Richards '603 Patent, for that patent to be valid.

86. By means of false, deceptive, and defamatory statements and other illegal actions, Defendants have sought to make it impossible for Plaintiff to license the Richards '603 patent, unless Plaintiff gives to Defendants large financial rewards that Defendants have not earned and do not deserve.

Wherefore, Plaintiff Richards requests the Court to issue:

(i) a declaratory judgment declaring that Ayusman Sen and/or Minren Lin are not co-inventors of the Richards '603 Patent;

(ii) a permanent injunction prohibiting Defendants from interfering with licensing of the Richards '603 patent by Plaintiff; and,

(iii) such other relief as this Court may deem necessary and proper.

## COUNT III

## DEFAMATION, SLANDER OF TITLE, AND INJURIOUS FALSEHOOD

87. Paragraphs 1 - 81 are realleged and incorporated herein in their entirety.

88. Defendants' false, defamatory, fraudulent, and unlawful statements and declarations concerning the Plaintiff have inflicted monetary damages and losses on Plaintiff.

89. Defendants' falsehoods have influenced the conduct of third parties in the oil, gas,

29

and petrochemical industries, causing them to refrain from licensing technology which they otherwise would use, thereby damaging the value of the Richards '603 patent and other patent rights that belong to Plaintiff Richards.

90. Defendants' wrongful conduct has directly caused Plaintiff to incur losses from the sale or licensing of rights to use the '603 Patent, and have imposed costs and expenses (including attorneys' fees and costs) on Plaintiff. The financial losses caused by Defendants' damage to Plaintiff's lawful rights to license or sell the Richards '603 patent are continuing and ongoing.

91. Defendants have inflicted wrongful acts and damage on Plaintiff, with malicious intent and without any justification, in an attempt to extract unearned and undeserved financial rewards from Plaintiff.

Wherefore, Plaintiff Richards requests judgment against Defendants for damages resulting from the injurious falsehoods, including attorneys' fees and costs and also including punitive or exemplary damages, and also requests such other relief as this Court may deem necessary and proper.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

92. Paragraphs 1 - 81 are realleged and incorporated herein in their entirety.

93. Defendants intentionally and without justification have interfered severely with Plaintiff's past, ongoing, and prospective business relationships with numerous oil, gas, and petrochemical companies.

94. Plaintiff has suffered severe financial damages as a result of Defendants' interference with Plaintiff' business relationships.

30

Wherefore, Plaintiff requests an award of both actual and punitive damages to be imposed on Defendants, for financial damages resulting from Defendants' tortious interference with business relationships, and Plaintiff requests such other relief as this Court may deem necessary and proper.

## COUNT V
## UNFAIR COMPETITION

95. Paragraphs 1 - 81 are realleged and incorporated herein in their entirety.

96. Defendants have publicly claimed that they are the discoverers, creators, and owners of a valuable patent (the Sen '226 patent) that can be licensed by oil, gas, and petrochemical services. For the purposes of licensing and other business activities, the rights, authority, and entitlements which that patent purports to represent, embody, and protect can be classified as "services".

97. The Defendants have falsely depicted and misrepresented the origin, inventorship, ownership, authenticity, and legality of the services represented by the Sen '226 patent, in ways that are deliberately intended to deceive and cause confusion among oil, gas, and petrochemical companies that are potential licensees of such patent rights.

98. Such actions by Defendants violate 15 U.S.C. 1125(a), and have damaged the Plaintiff and his lawful patent rights.

Wherefore, the Plaintiff requests an award of both actual and punitive damages to be imposed on Defendants, for financial damages resulting from Defendants' deceptive and unlawful acts of unfair competition in violation of 15 U.S.C. 1125(a), and Plaintiff also requests such other relief as this Court may deem necessary and proper.

## COUNT VI
## ANTITRUST VIOLATIONS

99. Paragraphs 1 - 81 are realleged and incorporated herein in their entirety.

100. By acts of fraud and wrongdoing which created an unlawful and improper monopoly via a fraudulent patent, Defendants violated the antitrust laws of the U.S.

Wherefore, as provided by 15 U.S.C. 15,  the Plaintiff demands a treble damage award against Defendants Penn State University, Penn State Research Foundation, and McQuaide Blasko et al., resulting from those Defendants' use of fraud and other illegal acts to obtain an unlawful monopoly in restraint of interstate commerce, and Plaintiff also requests such other relief as this Court may deem necessary and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury, on all issues so triable.

Dated this _13th_ day of August 2009.

Respectfully submitted,

By:

Jeffrey H. Garland
        Fla. Bar No. 320765
102 N 2nd Street
Fort Pierce, FL 34950
Telephone (772) 489-2200
Fax (772) 489-0610
Attorney for Plaintiff

32

℀JS 44   (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

ALAN RICHARDS

09 - 14280

**(b)** County of Residence of First Listed Plaintiff   Martin County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jeffrey H. Garland
102 N 2nd Street
Fort Pierce, FL 34950

CIV-MOORE

MAGISTRATE JUDGE
LYNCH

09cv14280

**DEFENDANTS**

AYUSMAN SEN, PENNSYLVANIA STATE UNIVERSITY,
PENN STATE RESEARCH FOUNDATION, et al

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
OF LAND INVOLVED.

FILED by ____ D.C.

Attorneys (If Known)

Laura Ganoza, Esq.
Foley & Lardner (Miami, FL)

AUG 13 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. PIERCE

**(d)** Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☑ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☑ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES   (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Reg. | ☑ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine |  | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 385 Property Damage | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | Product Liability | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General |  | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** |  | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | |
|  | Employment | ☐ 550 Civil Rights | Application | | |
|  | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | ☐ 950 Constitutionality of State |
|  | Other | | Detainee | | Statutes |
|  | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
|  | | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1  Original Proceeding
☐ 2  Removed from State Court
☑ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☑ YES ☐ NO      b) Related Cases ☐ YES ☐ NO

JUDGE K. MICHAEL MOORE      DOCKET NUMBER 2:07 cv 14254 KMM

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Alleged fraud which led to issuance of US patent 7,119,226 (Sen et al 2006)

LENGTH OF TRIAL via  4  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☑ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

SIGNATURE OF ATTORNEY OF RECORD

DATE  8/13/99

FOR OFFICE USE ONLY
AMOUNT $350.00   RECEIPT # 235192   IFP