**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.:  2:09-cv-14280-KMM**

Alan Richards et al

       Plaintiffs,

vs.

Ayusman Sen et al,

       Defendants

_____/


**PLAINTIFF'S  MEMORANDUM  OF  LAW**
**IN  REPLY  TO  MOTION  TO  DISMISS**


      COMES NOW PLAINTIFF Alan Richards, through his co-counsel Patrick Kelly, and submits the following to the Court in reply to the Defendant's Motion to Dismiss, submitted on November 16, 2009.

      This Court has already written a careful and extensive analysis of the legal standards for establishing jurisdiction over the Defendants in this federal court. What needs to be done now is to apply the law, to the facts of this case.


**ISSUE 1. JURISDICTION IS ENTIRELY PROPER AND VALID UNDER THE FLORIDA "LONG ARM" STATUTE AND THE POSNER PRECEDENT**

      The first prong of the analysis this Court must apply centers on the question of whether the Defendants can be "reached" under the Florida "long arm" statute. There are no contract claims remaining in this refiled version of the lawsuit, and the basis of "special" (rather than general) jurisdiction arises from Florida Statutes 48.193(1)(b), which states in relevant part:


      48.193 Acts subjecting person to jurisdiction of courts of state

1

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

(b) Committing a tortious act within this state.

In interpreting the phrase, "a tortious act within this state", numerous state and federal decisions in Florida have held that a tort is indeed committed within the state of Florida, if it causes an injury within the state of Florida. Although the Motion to Dismiss goes to great lengths and volume in an effort to clutter and cloud the issue, nowhere does it bother to even cite (let alone address, analyze, or attempt to overcome or distinguish) the controlling precedent in this area, which is the 11th Circuit's holding in <u>Posner, et al. v. Essex Insur. Co. Ltd.</u> 178 F.3d 1209, 1214 (11th Cir. 1999). That decision analyzed that specific issue at some length, since the outcome of that decision hinged on exactly that issue. After identifying and discussing various state appellate court decisions which had come down on both sides of that issue, the 11th Circuit directly held:

> "Throughout this longstanding conflict among the state district courts of appeal, ***this court consistently has applied the broader construction of subsection (1)(b)***. See Robinson v. Giarmarco & Bill, P.C. , 74 F.3d 253, 257 (11th Cir. 1996) ... Sun Bank, N.A. v. E.F. Hutton & Co. , 926 F.2d 1030, 1033-34 (11th Cir. 1991) ... Bangor Punta Operations, Inc. v. Universal Marine Co. , 543 F.2d 1107, 1109 (5th Cir. 1976); Rebozo v. Washington Post Co. , 515 F.2d 1208, 1212-13 (5th Cir. 1975).
>
> "Of course, if the Florida Supreme Court were to reject our construction of subsection (1)(b), we would be obliged in future cases to follow that Court's interpretation of the statute. ... ***Absent a contrary decision by that Court***, however, ***we are bound in this case to follow this court's firmly established precedent, which interprets subsection (1)(b) to apply to defendants committing tortious acts outside the state that cause injury in Florida.*** [ftn. 9]

Just as the 11th Circuit Court of Appeals was "bound to follow this firmly established precedent," so is this Court. And finally, it should also be noted that numerous decisions issued since 1999 (both federal and state) are fully in accord with that interpretation of the "tort" clause in the Florida long-arm statute; a few examples include <u>Elite Aluminum Corp. v. Trout</u>, S.D.Fla. 2006, 451 F.Supp.2d 1311; <u>DiMaggio, LLC. v. City, County of San Francisco</u>, S.D.Fla. 2000, 187 F.Supp.2d 1359; <u>Norris v. Davis</u>, S.D.Fla. 1997, 958 F.Supp. 606; <u>Korman v. Kent</u>, App. 4

Dist., 821 So.2d 408 (2002), review dismissed 829 So.2d 918.

To help simplify this portion of the analysis despite the best efforts of Defendants' counsel to clutter and confuse it, Plaintiff has asserted (in the Complaint) and continues to assert the following: a specific, direct, deliberate, and targeted act by Defendants sank to a level of being such a grossly and reprehensibly false, hurtful, and malicious act of libel and defamation -- which was directly solely and exclusively at Plaintiff Alan Richards, who was named as the sole target and victim of the utterly false published attack against him -- that it can and should quickly, cleanly, and unequivocally resolve any analysis of the Florida loong-arm statute to a close, in favor of the Plaintiff, so that careful and serious attention can then be given to the Due Process portion of the analysis.

The malicious, targeted, and hurtful tortious and defamatory act by Defendants, which can and should resolve the "long arm" question clearly and quickly, was the February 2009 publication of a series of utterly and totally false accusations against Plaintiff Richards, by Defendants. Those false accusations specifically, directly, and explicitly named Alan Richards as the person who was targeted by those false accusations, and they accused Richards of committing criminal acts of theft and misappropriation, by claiming that Richards had stolen and misappropriated the Defendants' property.

Those accusations against Richards are totally and utterly false, as clearly shown by the evidence set forth in the complaint and the Exhibits. However, Plaintiff Richards has no obligation to actually prove the falsity of those accusations, at this time. For the purpose of evaluating the Defendants' Motion to Dismiss, under the legal standards set forth in cases such as Morris v. SSE, Inc., 843 F.2d 489 (11th Cir. 1988); Corneal v. CF Hosting, Inc., 187 F. Supp.2d 1372 (S.D.Fla. 2001); and Venetian Salami Co. v. J.S. Parthenais, 554 So.2d 499, 502 (Fla. 1989), this Court has a legal obligation to simply assume that Defendants' attack on Richards, when they accused Richards of being a thief who had stolen Defendants' property, were indeed false. *It is worth the Court's time and attention to note in particular that the Defendants' Motion to Dismiss made no effort, of any sort, whatsoever, to rebut or deny the Plaintiff's assertion that the attacks made against Plaintiff by Defendants, in February 2009, were false.*

Because accusations of criminal conduct are defamatory "on their face" (without requiring any additional facts or information), those false accusations were tortious and injurious

3

acts. Those tortious attacks were knowingly and deliberately targeted against someone who was fully known to the Defendants, when the torts were committed, to be a Florida resident.

That particular tortious act, by Defendants, has been pointed out in particular, because it is believed to clearly and undeniably meet, satisfy, and indeed far surpass the requirements of the Florida Long-Arm statute, as set forth in Florida Statutes 48.193(1)(b). Once that point has been established, so that Florida law can properly be used to protect a Florida resident and his property, it is believed that the other counts in the current Complaint will properly align with those same principles and analysis, and/or will be properly classified as ancillary and/or pendant, so that they can and should be joined in the same proceeding with the defamation count.

There is one other issue which must be addressed before the analysis turns to the Due Process clause. It is discussed immediately below.

## ISSUE 2: DEFENDANTS' CLAIM OF AN ABSOLUTE PRIVILEGE TO COMMIT LIBEL AND DEFAMATION, IN A PATENT OFFICE PROCEEDING, IS MISGUIDED, MISLEADING, AND DANGEROUSLY WRONG

The Defendants' Motion to Dismiss, at pages 26-27, misinterprets and misrepresents several court decisions, as part of Defendants' effort to argue that *all Defendants* (and not just the *attorneys* who represented the *other* Defendants) were entitled to an absolute privilege to commit libel and defamation against the Plaintiff, without any risk of being held accountable in a federal court, so long as their false, libelous, and defamatory accusations were made in a "quadi-judicial" proceeding.

That argument by Defendants' counsel directly misinterprets and misrepresents every court decision she cited in support of her argument. To understand why, this Court must clearly understand that on February 19, 2009, *three different signed statements* were submitted to the Patent Office, by Defendants.

*One of those three statements* was signed by Bradley Swope, who works at the Defendant McQuaide Blasko law firm. As it turns out, Swope is *NOT* an attorney at all; instead, he is merely a "patent agent", as indicated on the Patent Office's official roster of all registered attorneys and agents. That status, in itself, raises serious questions about whether Swope is

4

entitled to the type of privilege or immunity, against accusations of defamation, that is provided to actual "attorneys". However, it is not necessary for this Court to address that issue, at this time, because of the following fact.

     **The other two false and defamatory statements** that were submitted to the Patent Office, in Feebruary 2009, were signed by:

     (i) Defendant Ayusman Sen, a chemistry professor at Defendant Penn State University, who definitely is NOT an attorney; and,

     (ii) Minren Lin (Sen's research assistant), who also is employed as a faculty member by Defendant Penn State University, and who also definitely is NOT an attorney.

     The fact that Sen and Lin are **NOT** attorneys is crucial, in applying the law, and in understanding why the Defendants' claim, in the Motion to Dismiss, that **all** of Defendants had an absolute privilege to commit libel and defamation against the Plaintiff, must not be accepted or endorsed by this Court.

     The Motion to Dismiss states, on pages 26-27:

> "To the extent that Plaintiff attempts to rely upon Defendants' statements to the PTO during the reexamination proceeding as a basis for his defamation claim, Plaintiff's claim must be dismissed. PTO proceedings are quasi-judicial, and therefore, statements made in front of the PTO are afforded the same privilege as statements made in a judicial proceeding. See United States v. American Bell Tel. Co. 128 U.S. 315, 363 (1888) ... Ball Corp. v. Xidex Corp., 967 F.2d 1440, 1445 (10th Cir. 1992) ... see also Zinc V. Old Navy (Apparel) Inc., 348 F. Supp. 2d 275, 281 (S.D.N.Y. 2004) ... For all the foregoing reasons, Count III cannot be sustained and must be dismissed, with prejudice."

Those cases do not say or suggest, at all or in any way, that all statements made in front of the PTO are privileged against any claims of defamation. Instead, they create and carve out a specific and narrow privilege, **which applies only to private attorneys who are representing clients**. As stated in *Ball v. Xidex*, which directly cites the standard precedent which set forth the law in this field:

> "'Fearless administration of justice requires ... that **an attorney** have the privilege of **representing his [or her] client's interests**, without the constant menace of claims for libel.' *Bleecker v. Drury*, 149 F.2d 770, 771 (2d Cir.1945). The integrity of **our adversarial system would be compromised if advocates** were forced to steer their course

between zealousness on the one hand, and fear of liability for damages on the other. Absolute immunity from defamation claims not only frees *counsel* from the harassment and intimidation of threatened lawsuits but also blocks a party that loses in one forum from seeking retaliation in another. ... We hold, therefore, that *private lawyers are entitled to absolute immunity* from charges of defamation based on statements in the quasi-judicial setting of PTO proceedings. ... Our holding on absolute immunity represents a license for *counsel* to speak freely in PTO proceedings; *it is not a license to commit intentional torts.*" (emphasis added)

The Motion to Dismiss also cited <u>Zinc v. Old Navy (Apparel) Inc.</u> (actually <u>Zdenek Marek d/b/a Zinc v. Old Navy (Apparel) Inc. and Old Navy Inc.</u>), 348 F.Supp.2d 275,281 (S.D.N.Y., 2004) in an effort to create and assert a broad principle that would *NOT* be limited to attorneys, and which would, instead, create a non-reviewable license for ***anyone*** to flagrantly defame anyone else, so long as they do it in front of the Patent Office. That attempt, by Defendants' counsel, to mislead this Court into creating an entirely new and radically different precedent that would vary sharply from the established and respected law in this area, is embodied in this carefully-edited quote from the <u>Marek v. Old Navy</u> decision:

> "[S]tatements made in judicial and quasi-judicial proceedings are privileged and may not be actionable so long as they are pertinent to the controversy." (page 26 of Defendants' Motion to Dismiss).

However, the judge who wrote that decision did not intend, at all or in any way, to take a position which extended beyond the well-established position set forth in <u>Bleecker</u>. Indeed, the judge who wrote the <u>Marek v. Old Navy</u> decision specifically and explicitly stated that he was merely applying a "well established principle of New York law", rather than exploring new legal territory. Here is his actual quote, and this Court is urged to pay attention to both what preceded, and what followed, the truncated quote in the Defendants' Motion to Dismiss:

> "***It is a well established principle of New York law*** that statements made in judicial and quasi-judicial proceedings are privileged and may not be actionable so long as they are pertinent to the controversy. See, e.g., <u>Bleecker v. Drury</u>, 149 F.2d 770, 771 (2d Cir. 1945) ("Fearless administration of justice requires, among other things, that ***an attorney***

6

> *have the privilege of representing his client's interests*, without the constant menace of
> claims for libel."); Anonymous v. Trenkman, 48 F.2d 571, 573-74 (2d Cir. 1931) (stating
> that "*counsel are privileged* with respect to any statements, oral or written, made in
> judicial proceedings and pertinent thereto"); Andrews v. Gardiner, 224 N.Y. 440, 445,
> 121 N.E. 341, 342 (1918) (Cardozo, J.) (same)."

Although the Marek v. Old Navy decision does not directly and explicitly state that the assertedly
libelous statements were made by one or more attorneys while representing clients, the remainder
of the paragraph quoted above make that fact abundantly clear. The judge directly and explicitly
stated that he was merely following a "well established principle of New York law"; and, he
immediately followed and supported that statement, by citing three cases, all of which make it
abundantly and explicitly clear that any such statements are privileged against claims of libel,
only when made *by attorneys representing clients.*

Accordingly, the correct view is that arguably false statements are indeed privileged,
against accusations of libel or defamation, when made in a quasi-judicial setting *by an attorney*,
during the course of representing a client. There are indeed good, valid, and even compelling
reasons for that policy and practice. However, those reasons, and the language of the decisions
cited in the Motion to Dismiss, most emphatically do *NOT* give *NON*-attorneys an absolute and
unlimited privilege to slander, libel, and defame their opponents and then dance away with
impunity and immunity. Despite the urgings of Defendants' counsel, there are *NO* good public
policy reasons for any court to take that position, and there apparently are *no* court decisions
which uphold or support any such policy.

This leads back to the following crucial facts, which totally undercut and directly
contradict Defendant's arguments. Out of the three signed documents that were submitted to the
Patent Office, by Defendants, on February 19, 2009:

(1) One of those documents was signed by Defendant Ayusman Sen, who most
definitely is *NOT* an attorney;

(2) Another document was signed by Minren Lin, an employee of Defendant Penn
State University, who also most definitely is *NOT* an attorney; and,

(3) The third signed document was submitted by Bradley Swope, who also is *NOT*
an attorney.

As mentioned above, Mr. Swope's status as a "patent agent", rather than an attorney, raises questions about whether he should also be protected by the privilege and immunity which is used to protect attorneys against the threat of charges of libel and defamation when they zealously represent clients in "quasi-judicial" proceedings. However, this Court does *NOT* need to analyze or address those questions, because any analysis of the Defendants' argument for immunity against the defamation count should terminate, immediately and conclusively, as soon as it is pointed out that neither Ayusman Sen nor Minren Lin qualified for that privilege, when they submitted their sworn but utterly false accusations against Alan Richards, to the Patent Office.

Indeed, the malevolence and malice which lurks in their defamation of Richards is rendered even more reprehensible, and actionable, by the fact that, in truth, they both knew perfectly well that Richards had paid a lot of money, for the things they accused him of stealing. Furthermore, they also knew, when they signed their false attacks against Richards, that in fact, Richards was the one who had discovered the chemical process, and who had taught it to both of them. Those facts are proven by their own words, which they (fraudulently) concealed from the Patent Office when they submitted their false accusations against Richards, in February 2009.

As a registered patent attorney who has been committed for nearly 30 years to trying to help actual inventors while also trying to help uphold the integrity, dignity, value, and public service orientation of the patent system in America, the undersigned wishes to further state that nearly everything the Defendant McQuaide Blasko law firm has done to date, and a number of specific actions by Defendants' counsel as well, have been deeply disturbing, and extremely offensive. If Ms. Ganoza believes it is within her rights, as a non-patent attorney, to try to create a federal court decision that would directly undercut and terribly damage the Patent Office's commitment to its binding legal standard of "candor and good faith", by telling inventors that they, too, cannot be held liable in court for defamation even if they make outrageously false statements to the Patent Office, then I have an obligation as a patent attorney to stand up and say, "Your Honor, that would be terribly wrong, and severely destructive, so please, do not issue a decision like that."

Finally, it should be noted that the claim of defamation that has been lodged against the Defendant McQuaide Blasko law firm should *NOT* be dismissed at this time, since the actions of that law firm, during Defendants' battles against Plaintiff Richards, almost certainly were NOT

limited to "quasi-judicial proceedings". Instead, Plaintiff Richards has specific reason to believe that a number of oil, gas, and petrochemical companies have made quiet and private inquiries to Penn State University, in order to evaluate the ongoing disputes between Richards versus Sen and Penn State. It is virtually certain that any such inquiries were forwarded to the attorneys at McQuaide Blasko, to reply to those oil, gas, and petrochemical companies in behalf of Penn State; that is standard practice, whenever an outside company inquires about a legal dispute. Accordingly, discovery will be needed, to determine what the Defendant McQuaide Blasko law firm may have said to those oil, gas, and petrochemical companies, about Alan Richards. Based on everything known to date, whatever the attorneys at the Defendant McQuaide Blasko law firm may have said to those oil and gas companies, to try to explain, justify, and defend what they had done, almost certainly was as false, and as defamatory to Richards, as the false and fraudulents accusations they made about Richards to the Patent Office (which were made with the full knowledge and realization that their attacks against Richards would be published, and would be seen by Richards).

Therefore, the defamation count against the Defendant McQuaide Blasko law firm should be allowed to stand, at least for now. During discovery, Plaintiff Richards should be allowed to inquire into what the Defendant McQuaide Blasko law firm said and wrote, to oil and gas companies that contacted Penn State and asked, "What is going on here?"

**ISSUE 3: THE DUE PROCESS ANALYSIS**

The Due Process analysis must determine "whether sufficient minimum contacts exist ... so that maintenance of the suit does not offend traditional notions of fair play and substantial justice." D.W. Mercer, Inc., 146 F. Supp.2d at 1276 (citing Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 256 (11th Cir. 1996)). A court must ensure that "the defendant [had] `fair warning' that a particular activity may subject him to the jurisdiction of a foreign sovereign." Madara v. Hall, 916 F.2d 1510, 1516 (11th Cir. 1990) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). "This fair warning requirement is satisfied if the defendant has `purposefully directed' his activities at the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Id. (internal citation omitted). "Additionally, the defendant's

9

conduct and connection with the forum must be of a character that he should reasonably anticipate being haled into court there." Id. (quoting Burger King, 471 U.S. at 474).

There are three different reasons why the Due Process requirement is satisfied, in this case. All three will be summarized below. The reason which is believed to provide the strongest basis for jurisdiction in Florida is listed first, so that if the Court agrees with that basis, it can be spared the task of having to wrestle with either of the other two reasons.

**Basis #1 for Due Process Compliance:**

**The February 2009 Actions by Defendants**

Plaintiff's Exhibit 18 contains a set of false, fraudulent, and defamatory attacks and accusations by Defendants, against the Plaintiff and his property. Those papers, signed and submitted by Defendants with the full knowledge and intent that they would be openly published as a routine procedure on the Patent Office's public website, to make them readily accessible at no charge to all interested members of the public:

(i) personally attacked Alan Richards, who was identified by name, and who was accused (falsely) by Defendants of thievery and of stealing property from the Defendants;

(ii) attacked and criticized the Plaintiff's patents, including both his Patent Cooperation Treaty application, number WO 2004/41399, and two "provisional" patent applications which belong to Richards and which formed an important basis for Richards' filing date (US provisionals 60/424,091 and 60/480,183). Briefly, the Defendants's signed and published papers falsely accused Richards' PCT application of containing information that had been stolen from Defendants Ayusman Sen and Penn State University.

Those accusations, that Richards stole property which belonged to Defendants, are indeed false, for the reasons described in the sworn affidavit and emails contained in Plaintiff's Exhibit 19. However, this Court does not need to analyze that affidavit and those emails at this time, because it is required, for the purposes of deciding on a Motion to Dismiss, to simply accept that the assertions in the Plaintiff's Complaint are true, since the Defendants have not submitted any evidence to try to overcome that portion of the Plaintiff's Complaint. Indeed, it is worth noting that Defendants, instead of trying to show that their February 2009 published attacks against Richards were actually true, attempted instead to hide behind the defense that they actually had a privilege to make false and defamatory attacks against the Plaintiff, so long as the false attacks were made in a quasi-judicial proceeding before the Patent Office. As described above, that type of privilege simply does not apply to false and defamatory attacks that were signed and submitted by people who are not attorneys, representing clients, so it does not and cannot excuse the tortious acts of defamation committed by Defendants, against Plaintiff, in February 2009.

At this point, it is crucial to note that those acts of defamation, in February 2009, were

11

committed by Defendants a year and a half after the first lawsuit was filed against Defendants. Those tortious and defamatory acts were committed by Defendants, not merely while they had reason to believe that they *MIGHT* be sued in Florida, but actually while a prior lawsuit against them was already in progress, in Florida. Under any normal circumstances, a normal defendant and a competent attorney would regard that situation as fair and even compelling notification and warning that they needed to handle things properly and lawfully, so that they would not give the Plaintiff even more, even stronger, and even better grounds for establishing jurisdiction over them, in Florida. However, very little that the Defendants have done, in this case, can stand up to scrutiny. To put it simply, their actions in February 2009 make no more sense than their efforts to steal Alan Richards' patent rights in the first place (which required them to ignore a long, detailed, and extensive paper trail which proves that their own purported inventors stated, in writing, in their own words, multiple times, that they actually learned about the methane conversion process from Alan Richards).

The bottom line is that the Defendants' actions in February 2009, in making an utterly false and defamatory attack against someone they knew was a Florida resident, while knowing full well that they not only "might be" haled into court in Florida, but that they *ALREADY HAD BEEN* haled into court in Florida, have removed any questions or doubts about whether it is fair, under the principles of Due Process, to hold them accountable in a Florida court, for the damage they have tortiously inflicted on a Florida resident and Florida property. They made totally false and severely defamatory attacks against a single named and targeted individual and his property, at a time when they knew perfectly well that the victim of their false attacks, and his property, were located in Florida, and had already commenced an effort to hold them accountable in a Florida court. Those facts clearly and undeniably meet and surpass any and all of the Due Process requirements that are set forth in decisions like <u>D.W. Mercer, Inc.</u>, <u>Robinson v. Giarmarco & Bill, P.C.</u>, <u>Madara v. Hall</u>, and <u>Burger King Corp. v. Rudzewicz</u>, supra.

On this subject, the Court must also recognize that under the law, patent rights are defined, classified, and treated as "personal property". This arises directly from the patent statute, codified in 35 U.S.C. 261 (entitled "Ownership; assignment"), which states, "*patents shall have the attributes of personal property*."

Plaintiff Richards has resided in Florida since well before May 2003, the earliest relevant

date. Since patents are "personal property", the patent rights to the chemical process that Richards discovered and invented are deemed to be located (and to "reside", to the extent that inanimate property can "reside" anywhere) in the same state where Richards resided. As a direct result, all patent rights which lawfully attach to the chemical process that Alan Richards discovered and invented are deemed to be located in Florida, and are deemed by law to be located within the Southern District of Florida.

Plaintiff's Exhibit 20 (previously submitted with a prior version of the Complaint, and resubmitted simultaneously with this Memorandum of Law) clearly shows that the Defendants were directly and explicitly informed, as early as April 2004 (before they ever filed their first patent application, and before they took any of the tortious and wrongful actions that are relevant to this dispute), that the patent rights in Richard's invention were **NOT** and had never been assigned or transferred, by Richards, to the company that Richards founded and owned (GTL Technologies Inc.). Plaintiff Richards was not under any legal duty, of any sort, to assign those patent rights to the company he had formed, and for valid reasons, he chose to not do so, and to retain those patent rights for the time being as his own personal property. The Defendants were directly and explicitly informed of that fact, in writing, by the letter of April 2, 2004, which was sent by Richards' attorney (the undersigned Patrick Kelly) to attorney Mark Righter, the attorney for the Defendants. In a reply letter dated April 21, 2004, Attorney Righter directly and explicitly acknowledged that he had received the April 2 letter from Kelly, and had noticed and understood the assertion that Richards, personally, was the owner of the patent rights.

When these facts are combined with the fact that Defendants had already been notified, in writing, at least twice, that Alan Richards lived and worked in Florida (see Plaintiff's Exhibit 3), it becomes clear that Defendants were directly and explicitly notified and warned, by at least early April 2004 -- before they committed any of the tortious acts described in the Complaint -- that:

(i) Richards resided and worked in Florida, at all relevant times; and,

(ii) the patent rights in the chemical process that Richard had brought and disclosed to Sen and Lin, at Penn State, remained as Richards' personal property, and had not been assigned or otherwise transferred to GTL Technologies Inc., and, therefore,

(iii) the patent rights in the chemical process continued to be located in Florida at all

relevant times.

**Basis #2 for Due Process Compliance:**

**The "Advance Warning" Requirements Were Met and Satisfied At Least A Year Before Defendants Made Their Decision to Pay the $1000 Issue Fee To Have Sen's Fraudulent Patent Application Issued**

As mentioned elsewhere, the crucial date for determining whether the Defendants had fair warning that they might be haled into a Florida court arrived, ***NOT*** when they signed the confidentiality and STTR contracts in the summer of 2003, but in ***the summer of 2006***. That was the time period when the Defendants had to decide whether they should pay a $1000 fee, to have Sen's (fraudulent) patent application issue as a (fraudulent and unenforceable) patent. As they faced that decision, they were obliged, by the patent law itself, to properly take into account everything that they knew, at that time, about the Sen patent application. As stated in paragraph 47 of the Complaint, that legal obligation airses from the continuing and ongoing requirement for "candor and good faith" in ALL dealings that any attorneys and inventors have, with the Patent Office, as set forth in sections 1.56, 1.97, 10.23, and 10.85 of Title 37 of the Code of Federal Regulations (CFR).

With that in mind, the Court is urged to consider the letter from Plaintiff's attorney, which was sent to five different officials at Defendant Penn State University, on June 16, 2005 (Plaintiff's Exhibit 21). That letter was sent to those five officials ***A FULL YEAR BEFORE*** those Penn State had to decide whether to pay an issuance and printing fee of $1000, to cover the costs of having Sen's fraudulent patent application actually issue as a patent. As shown on the letter, those officials were:

Robert Killoren, Associate Vice President of Research
(a high-level official responsible for monitoring and supervising research activities at Penn State)

Robert L. Baker, Office of Sponsored Programs
(the top Penn State official responsible for supervising interactions between Penn State, and outside companies that pay to have research done at Penn State

Ron Huss, Director, Intellectual Property Office

14

(also President of the Defendant Penn State Research Foundation)

Robert Meyer
(a high-level supervisor in the College of Science, which includes the Chemistry Department, where Sen worked)

Matthew Smith
(the staff aide in Penn State's Intellectual Property Office who was assigned to monitor the relationship between Penn State, and GTL Technologies)

There are at least half a dozen statements, in the letter of June 16, 2005, which "screamed out" loud and flashing warning signals that gave *all five of those Penn State officials* advance notice that: (i) things had gone VERY seriously wrong, in the STTR contract between Penn State and GTL Technologies; and, (ii) anyone with supervising authority concerning that STTR contract had a duty to step in, find out what was actually going on, and take corrective action.

Here is just a sample of those warnings:


" ... that description should oblige each and all of you to recognize that Sen's act, in signing an oath stating that he was the inventor while Richards did not qualify as a coinventor, has placed him in very serious jeopardy, both legal and otherwise."

"... I'm enclosing two e-mails Dr. Sen sent to Alan Richards. In the first e-mail, dated June 16, 2003, Sen refers (twice) to the chemical process as the "Richards system". Sen also included the following direct statement: "I look forward to the opportunity to test out some [of] *your ideas*."

In the second enclosed e-mail, dated March 17, 2004, Dr. Sen explicitly stated, "*I should have no further role in the project* beyond the subcontract which ends next month. *The project is something you started and you can take credit accordingly - I will be happy to get a publication out of it.*"

Despite both of those candid statements, Sen later signed a sworn oath, trying to claim the ideas described in the patent application as his own, with Alan Richards not even deserving to be listed as a coinventor."

"I hope you understand the seriousness of this problem, and this letter. There are clear, direct, unavoidable conflicts between the different positions Dr. Sen took, in repeated reassurances to Alan Richards over a span of months, and then secretly filing a patent application covering Alan's ideas, that did not even list Alan as a coinventor."

" ... the enclosed e-mails from Ayusman Sen, to Alan Richards, are simple, clear, and direct. Those e-mails totally contradict and directly discredit Sen's claims in his patent application."

15

"... I would also highly recommend that Penn State begin seeking assistance from a second patent attorney who was not involved in drafting or filing that application, and whose obligation is to provide Penn State with objective and impartial counsel, after reviewing the facts."

"In complete seriousness, please ponder how it will affect Penn State's reputation if assertions such as the following are made in a public forum, with the support of a strong set of facts and documents that can be dated and proven:

> (i) a man and his company, acting in complete good faith, came to Penn State and paid $48,000, in cash, to have some lab work done to confirm the results of detailed computer modeling that had already been completed, with no help or involvement from anyone at Penn State;
>
> (ii) rather than being rewarded by good work, fiduciary care, and loyalty, the professor who did the tests actually tried to steal the results, and claim them as his own; and,
>
> (iii) the responsible officials at Penn State, upon being warned of the facts, chose to do nothing to solve the problem, and instead mounted an attack against an honest man who, in complete good faith, paid a Penn State professor to perform some lab tests."

"Since each and all of you are listed as recipients, you are hereby formally and specifically notified that a serious problem has arisen, in a matter that falls within the jurisdiction and responsibilities of your position at Penn State.

> Accordingly, I urge each and all of you to consider this matter seriously, and to take any actions that will protect the standing and reputation of Penn State. That is your responsibility, as an employee of Penn State."

The explicit and blunt warnings provided in that June 2005 letter, sent by an attorney representing a client, gave all five of those officials at Penn State University more than adequate advance notification and warning that they had a VERY serious problem on their hands.

When combined with other prior written correspondence showing that Penn State and its attorneys were specifically and directly warned and informed, in advance, that:

(i) the patent rights belonged to Alan Richards, as his personal property; and,

(ii) Alan Richards lived in Florida,

then it becomes abundantly clear that any competent attorney, and any group of trained and experienced officials who have been put in charge of administering a large university's patent portfolio, were indeed given more than adequate advance warning and notification that they

16

might well be haled into court in the Plaintiff's home state, since they were attacking the Plaintiff and his personal property.

**Basis #3 for Due Process Compliance:**

**The Requirements for Meeting Due Process Protections Are Lower, If a Defendant Has Committed a Crime That Directly Affects The Forum State**

While the comments below are not believed to be necessary to establish that Due Process has been met, the Plaintiff wishes to point out, for the record, that the U.S. Supreme Court has declared that different standards of Due Process apply, when a defendant has been accused of committing a crime.

In 1911, the U.S. Supreme Court issued Strassheim v. Daily, 221 U.S. 280 (1911). It remains as good law today, and has been cited frequently and with approval in numerous court decisions, and in numerous review articles which address various aspects of identity theft, scams, frauds, and other crimes that can be committed via the Internet, by thieves who remain in locations that are far removed from the states where their victims live.

The 1911 decision involved a man in Illinois, who bribed a Michigan official in charge of a public prison in Michigan to pay an inflated price for new equipment, when the equipment that was actually sold to the Michigan prison was old and worn. The events that enacted the bribe occurred while the Michigan official was visiting Illinois, and therefore, the Illinois man claimed that he should not be subjected to the jurisdiction of the courts in Michigan, since he had never entered Michigan.

The Supreme Court disagreed, and held that the Illinois man could indeed by subjected to the jurisdiction of the Michigan courts, without violating Due Process. In the words of Justice Holmes, which are cited in essentially every case in this field, "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm. . . ." [Id. at 285]

The Strassheim doctrine is mentioned, because there is an important element of overtly criminal activity by the Defendants, which this Court can and should take into account, as it considers the balance that must be reached in under the rubrics and principles of Due Process.

17

The Plaintiff's Complaint directly alleges that the damage inflicted on the Plaintiff, and on his property, arose directly from criminal acts by the Defendants, including acts which constituted fraud, theft, and obstruction of justice. Those allegations of overtly criminal acts, by Defendants, are strongly supported by documentary evidence, including documents written by Defendant Ayusman Sen himself. Defendant Sen's own written words show and prove that Sen did indeed learn about the chemical reaction from Alan Richards. Therefore, Defendant Sen's actions, in signing false and fraudulent statements, under oath, claiming that he and Lin (his lab assistant) were the only two inventors of an invention which in fact they had learned about from someone else, were acts of outright fraud, and theft, which are criminal acts.

The Court's attention is directed to the fact that the Defendants have not made *ANY* effort, of *ANY* sort, to deny, rebut, or refute the Plaintiff's allegations (or to rebut or explain away the emails and other documents which clearly indicate) that Defendant Sen committed fraud, theft, perjury, obstruction of justice, and other crimes. Since Defendants have declined and failed to even try to dispute or disprove the documents which show that Sen: (i) learned about the invention from Richards, then (ii) falsely claimed to have discovered the invention while concealing the fact that he learned about it from someone else, this Court has an obligation, under the law, to assume -- for the sake of deciding on the Motion to Dismiss -- that Sen did indeed make false and fraudulent statements to the Patent Office, as part of the commission of an act of theft.

The Court should also note the fact that Sen's signature, in his signed and sworn declaration submitted in Plaintiff's Exhibit 18, explicitly acknowledges that Sen was directly warned that if the statements he signed were false, then he could be punished by fine or imprisonment; and yet, he signed and submitted a statement that contained grossly and utterly false content, despite that explicit warning.

The undersigned attorney recognizes that there are major differences between: (i) accusations of criminal wrongdoing by a private party, in litigation, versus (ii) accusations of criminal wrongdoing by a prosecutor who is empowered to bring criminal indictments. Nevertheless, the logic, the reasoning, and the language of <u>Strassheim v. Daily</u>, supra, would appear to apply, in this particular case.

Furthermore, there are powerful public policy reasons why this Court, or any other federal

court, should directly state and openly declare that the doctrine and language set forth in Strassheim v. Daily can and should be expanded to cover civil lawsuits that are intended to recover or repair property that was stolen or damaged due to criminal acts. In view of the fact that identity theft and internet scams, frauds, and swindles have become rampant and even runaway crimes, the courts of the United States need to fairly recognize that if a criminal wrongdoer uses the internet or other means to swindle and steal from an innocent victim who may live thousands of miles away, the courts at all levels have compelling obligations to help protect and preserve the lawful rights of the innocent, rather than placing additional expenses, burdens, and disadvantages on the victims of crimes who are using lawful means to try to recover their stolen property. In view of the recession and the staggering budget deficits that are being faced by the federal, state, and local governments throughout the US, the ability of the criminal justice system to truly protect citizens, against criminal predators, has become even more limited amd curtailed, and citizens and taxpayers need to have a fair and valid right to resort to the courts, in civil litigation to try to recover or repair property that was stolen or vandalized by criminal acts. In interpreting and protecting the rights encompassed within the phrase "Due Process", the logic, reasoning, and doctrines set forth by the U.S. Supreme Court, in Strassheim v. Daily, deserve attention. If there are reasons why that decision should *NOT* be available and applicable, in a civil lawsuit that seeks to recover or repair property that was stolen, vandalized, or otherwise damaged by an overtly criminal act, this Court should explain and enunciate those reasons clearly. Alternately, if this Court chooses to use this case to issue an opinion that the Strassheim decision should indeed be extended to cover civil lawsuits intended to recover stolen property, that would be a just, appropriate, and publicly appreciated action.

Having stated the foregoing, it must be emphasized that in this particular case, the Plaintiff does *NOT* need to rely on the broader reach of jurisdiction that is provided by Strassheim, in cases involving criminal activity. Instead, in this proceeding, as set forth above in Basis #1 and Basis #2, the facts and documents clearly show that the appropriate standards of Due Process, as applied in purely civil matters, have indeed been met and satisfied.

**OTHER ISSUES RAISED IN THE MOTION TO DISMISS**

The undersigned attorney is fully cognizant that a number of other, additional issues have

been raised by Defendants, in the Motion to Dismiss. However, the jurisdictional issues raised by the Due Process question are of paramount importance, and require careful and focused attention, and all other issues will simply drop out, if jurisdiction is not agreed upon and established by this Court.

Accordingly, the Plaintiff hereby requests that any and all such other issues that have been raised by the Motion to Dismiss be held in abeyance for the time being. They can be addressed, and the entire status and terrain of this dispute can be addressed and simplified in a more orderly, useful, helpful, and appropriate manner, if those other, additional issues are suspended for the time being. If jurisdiction over this dispute is indeed established by this Court, those issues can be raised and addressed, and the various counts and claims in the Complaint, by means of one or more motions for judgment on the pleadings.

If the Court is unwilling to take that approach, then Plaintiff hereby asserts that:

(1) any and all of the additional counts, in the Complaint, can and should be addressed and considered by this Court, as ancillary and/or pendant matters that will properly belong in this proceeding, once the existence of jurisdiction over the Defendants has been established; and,

(2) due to the unusual nature and extreme offensiveness of the Defendants utterly false accusations against the Plaintiff, combined with the fact that the claimed chemical reaction is an industrial process that is of interest to only a limited number of oil, gas, and petrochemical companies, which are acutely aware of their worldwide "methane flaring" problems, the objections raised by the Defendants to the counts involving the Lanham act, antitrust abuse, and other issues should be denied, at this time, so that discovery can proceed into those issues.

The undersigned hereby certifies that a complete copy of this filing has been provided, via email, to all counsel listed on the attached Certificate of Service.


Date:   December 4, 2009                    Respectfully submitted,

                                           By:  s/ Patrick D. Kelly
                                           Patrick D. Kelly
                                              Co-counsel for Plaintiff
                                           11939 Manchester #403
                                           St. Louis, MO 63131
                                              phone: 314-822-8558
                                              fax: 314-822-8998

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Memorandum of Law was provided by e-mail, as an attached files in pdf format, on December 4, 2009, to all attorneys listed below.

s/ Patrick D. Kelly
Patrick D. Kelly
      Co-counsel for Plaintiff
11939 Manchester #403
St. Louis, MO 63131
            phone: 314-822-8558
            fax: 314-822-8998
            email: Patenter@aol.com

**Case No. 2:09-cv-14280-KMM**

Laura Ganoza, Esq.
Foley & Lardner
2 South Biscayne Blvd., Suite 1900
Miami, FL 33131
      Phone: 305-482-8400
      Fax: 305-482-8600
      lganoza@foley.com
      Attorney for Defendants

Patrick D. Kelly, Esq.
11939 Manchester #403
St. Louis, MO 63131
      Phone: 314-822-8558
      Fax: 314-822-8998
      Patenter@aol.com
      Co-counsel for Plaintiff

Jeffrey H. Garland
102 N 2nd  Street
Fort Pierce, FL 34950
      Phone: 772-489-2200
      Fax: 772-489-0610
      jgarland@treasurecoastlawyer.com
            Co-counsel for Plaintiff

1